UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

ALTAMAHA RIVERKEEPER and
OGEECHEE-CANOOCHEE RIVERKEEPER,

    Plaintiffs,

v.                606CV027

RUFUS YOUMANS, MABEL POOLE and
PINE TREE II, LLC,

    Defendants.

## ORDER

## I. INTRODUCTION

Plaintiffs Altamaha Riverkeeper and Ogeechee-Canoochee Riverkeeper (collectively "Riverkeeper") brought this CWA[1] citizen suit against defendants Rufus Youmans, Mabel Poole and Pine Tree II, LLC. Doc. # 1. Defendants owned a Wal-Mart construction site that allegedly discharged sediment into U.S. waters in violation of the CWA. *Id.* at 8.

The parties then settled (doc. ## 20, 21), and the Court dismissed this case but retained jurisdiction to enforce the Settlement. Doc. # 22. Part of the agreement required the defendants to place 15 acres of land in downtown Swainsboro, Georgia ("the parcel") under a permanent conservation easement.[2] Doc. # 20 ¶ 9, Attachment B. Claiming the defendants failed to comply with the conservation easement provision, Riverkeeper asks this Court to exercise its settlement enforcement jurisdiction. *Id.* at 1.

## II. BACKGROUND

As stated, the Settlement required the defendants to place a certain parcel of land (most of which is a manmade lake) under a conservation easement. Doc. # 20 ¶ 9. Expounding upon this, the parties included the following paragraph:

> The Parties agree that the Georgia Land Trust, 428 Bull Street, Suite 210, Savannah, Georgia, will be the Parties' first choice as holder of the conservation easement. Defendants will pay an appropriate endowment to the Georgia Land Trust, in an amount negotiated with that entity, to monitor, preserve, protect and defend the easement. Defendants will create the conservation easement through the standard procedures of the Georgia Land Trust, guided by the model conservation easement documents publicly available from that organization. In the event that the Georgia Land Trust is unable or unwilling to accept the proposed conservation easement, the Parties will confer and identify an appropriate alternative holder for the easement, which shall be comparable to the Georgia Land Trust. Defendants will retain final approval of the conservation easement holder. In the event the Parties cannot identify a mutually agreeable conservation easement holder, Defendants will create the conservation easement and will monitor, preserve, protect and defend the easement so long as Defendants retain any property interest in the property that contains the conservation easement. Upon Defendants' transfer of ownership rights in the property, the conservation easement shall not be extinguished, rather, Defendants' responsibilities under Paragraphs 9 and 10 shall pass to

---

[1] Clean Water Act, 33 U.S.C. § 1365 *et seq.*

[2] "A conservation easement is a legal agreement between a landowner and the land trust to protect the property's natural resources." http://www.galandtrust.org/FAQs.htm#What_is_CE (site as of 9/29/08).

subsequent owners pursuant to Paragraph 5 above.

Doc. # 20 ¶ 10.

Defendants then contacted the Georgia Land Trust (GLT) for information on creating a conservation easement. Doc. # 27-3 at 2. Over the course of nearly a year, they negotiated the terms of the parcel's easement, but ultimately the defendants would not accept GLT's final terms. Doc. # 32-3 at 3-7. Most of the negotiation-facts that follow are derived from three separate and unrebutted affidavits sworn out by Katherine Eddins, GLT's executive director. Doc. ## 27-3, 32-3, 34 exh. 1.

Defendants contacted the GLT on 11/1/06 for information about creating a conservation easement. Doc. # 27-3 at 2. In response, the GLC sent them several documents, including a "Landowners Interested in Donating Conservation Easement" memorandum outlining the standard procedure for creating an easement with the GLT. Doc. # 32-3 at 3. It states, "[w]e generally prepare the first draft of the Conservation Easement and Pledge agreement and send them to you for review and comment. At this point we try and focus on the reserved rights and restrictions in the Conservation Easement. This step will continue until both of us are satisfied." *Id.*

GLT's conservation planner, Frank McIntosh, then met with defendants at the parcel to discuss potential rights they would like to preserve. *Id.* at 4. Some of the rights they discussed were "peaceful enjoyment, right to maintain and care of the property and to undertake necessary timber maintenance, and fishing." *Id.* McIntosh then sent a draft of a proposed easement attached to an email stating, "[i]t is a pretty restrictive easement. Plenty of room to loosen it up within reason." *Id.*

Defendants' counsel ultimately responded to McIntosh with a "red-lined" version of the original draft that included: "provisions for roads, fencing, right of ways, the ability to subdivide the property, docks for adjoining landowners and the right to cut the timber/forest on the property." *Id.* at 5. McIntosh handed this over to GLT's counsel, who discussed these requests with defendants' counsel, "in order to clearly define the[se] additional rights...." *Id.* GLT's counsel always reviews potential easements as part of GLT's standard procedures. *Id.* But Eddins, the executive director, had to approve the defendants' requests before those could become a part of the easement. *Id.*

Neither Eddins nor GLT's counsel agreed to the defendants' additional requested rights. *Id.* at 6. As Eddins explained:

> My concern was that the only way we could possibly and responsibly protect and enhance the limited conservation values and enforce the easement on the Conservation Property, given its small size, location, condition and the fact that it was in an urbanizing/developing area behind commercial development was to 1) restrict timber harvesting; 2) restrict subdivision; 3) restrict docks; 4) restrict interior fencing; and 5) restrict development.

*Id.* GLT thus rejected defendants' proposed changes and declared they were only prepared to accept a "forever wild easement. This would mean no timber harvesting, no fences within the property (just along the boundaries if desired), no additional roads; and no docks from the neighboring properties onto the lake...." *Id.*

Defendants rejected the "forever wild easement," believing they had the right to do so

2

under the Settlement.[3] Doc. # 32 at 5. They then approached the Swainsboro-Emanuel County Joint Development Authority and the City of Swainsboro about holding defendants' "red-lined" version of the conservation easement. *Id.* at 6. Both entities refused to hold the easement. *Id.*

Because the defendants cannot find an alternative easement holder[4], they are prepared to create the conservation easement themselves and hold it in accordance with the contract. *Id.*; *see* doc. # 20 ¶ 10 ("In the event the Parties cannot identify a mutually agreeable conservation easement holder, Defendants will create the conservation easement and will monitor, preserve, protect and defend the easement....").

Riverkeeper objects to this, claiming that the defendants had no veto power in the event they did not like the easement proposed by GLT. And since GLT in fact is willing to hold the conservation easement created by its standard procedures, the defendants must place the easement in GLT's control (regardless of whether they like the terms). Doc. # 27 at 9; doc. # 33 at 1; *see also* doc. # 20 ¶ 10 ("Defendants will create the conservation easement through the standard procedures of the [GLT], guided by the model conservation easement documents publicly available from that organization. In the event that the [GLT] is unable or unwilling to accept the proposed conservation easement, the Parties will confer and identify an appropriate alternative holder for the easement, which shall be comparable to the [GLT]").

Accordingly, defendants believe that the Settlement allows them to propose the easement's terms, and if neither the GLT nor any other entity is willing to hold that easement, defendants get to hold it themselves. Riverkeeper disagrees and insists that defendants must place an easement created by the GLT's standard procedure *with* the GLT, no matter what the terms.

### III. ANALYSIS

#### A. The Conservation Easement

Riverkeeper asks this Court to enforce the Settlement. To determine whether defendants have breached it, and thus whether judicial enforcement is appropriate, the Court must resolve two issues. First, who is to hold the easement? Second, how did the parties intend to set the terms of the easement?

#### *1. Applicable Law*

A settlement agreement is a contract subject to the rules of statutory construction. *Demorest v. Roberts & Dunahoo Properties, LLC.*, 288 Ga. App. 708, 711-12 (2007). Georgia law governs this contract, so the Court applies Georgia's rules of contract construction. Doc. # 20 ¶ 21; *see Georgia R.R. Bank & Trust Co. v. Federal Deposit Ins. Corp.*, 758 F.2d 1548, 1551 (11th Cir. 1985) (""In interpreting a contract that is controlled by Georgia law, the rules of contractual construction as expounded by the Georgia courts are properly applicable in federal court"). Under Georgia law

> [t]he trial court must first decide whether the contract language is ambiguous. If it is, the trial court then applies the applicable rules of .contract construction in O.C.G.A. § 13-2-2.

---

[3] Defendants characterize this a little bit differently, claiming that the "[GLT] was unwilling to accept [their] proposed conservation easement." Doc. # 32 at 5.

[4] The Parties do not appear to have conferred to identify an alternative holder. Doc. # 32 at 5 n. 4; doc. # 33 at 5 n. 2.

3

If an ambiguity still remains, it must be resolved by the trier of fact. In construing a contract, courts must give words their usual and common meaning. And the entirety of the agreement should be looked to in arriving at the construction of any part. The contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others.

*Blueshift, Inc. v. Advanced Computing Tech.*, 273 Ga. App. 802, 805 (2005) (cites and punctuation omitted).

Ultimately, the intent of the parties must prevail despite unclear language or the rules of construction. O.C.G.A. § 13-2-3. In ascertaining intent, "the language of the agreement should be considered in light of all the surrounding circumstances, and the court should place itself as nearly as possible in the situation of the parties in seeking the true meaning and correct application of the contractual language." *Georgia R.R.*, 758 F.2d at 1552.

## 2. *Holder of the Easement*

Riverkeeper petitions the Court to require defendants to place the conservation easement with GLT. Doc. # 27. The core of plaintiffs' argument is that defendants are required to grant the conservation easement to GLT unless GLT is "unwilling or unable to accept the proposed conservation easement." Doc. #27 at 5. Because GLT is willing to hold the conservation easement, defendants must place it with them. By contrast, defendants contend that the Settlement identifies GLT as merely the first of many choices of the parties, doc. # 32 at 6, and so "it is ultimately the Defendants' choice as to who holds the ... conservation easement," *id.* at 7.

The Settlement's language is clear that GLT was intended to be the presumptive holder of the easement. If there is any ambiguity, it is resolved after applying the rule of construction that "the whole contract should be looked to in arriving at the construction of any part." O.C.G.A. § 13-2-2(4); *Fix v. McAllister*, 273 Ga.App. 463, 467 (2005). Settlement ¶ 10 sets forth three scenarios governing the easement holder:

(1) GLT "will be the Parties' first choice as holder of the conservation easement";

(2) "In the event that [GLT] is unable or unwilling to accept the proposed conservation easement, the Parties will confer and identify an appropriate holder for the easement which shall be comparable to [GLT]"; or

(3) "In the event the Parties cannot identify a mutually agreeable conservation easement holder, Defendants will create the conservation easement" and will hold it themselves.

Doc. # 20 at ¶ 10 (paraphrased). The rest of the language in ¶ 10 simply provides detail as to how each scenario will operate.

Defendants' assertion that they can choose whom they want to hold the easement rests on two arguments. They argue that "'choice' necessarily contemplates options, and 'first' necessarily contemplates subsequent possibilities." Doc. # 32 at 7. This interpretation ignores the subsequent provision that alternative holders only come into play "[i]n the event that [GLT] is unable or unwilling to accept the proposed conservation easement...." Doc. # 20 at ¶ 10.

Similarly, the provision that "[d]efendants

4

will retain final approval of the conservation easement holder" follows the condition that GLT be unwilling/unable to accept the easement *Id.* Thus, defendants' argument ignores the condition precedent to alternative choices and the veto over those choices.

Construing the contract as a whole, GLT was contemplated as the presumptive holder. Significant here is the fact that GLT is designated as "the Parties' first choice," and that choice is identified prominently in ¶ 10's first sentence. Moreover, GLT is the only potential holder identified by name, and is mentioned repeatedly throughout the paragraph. Finally, the parties agreed that any alternative holder must be "comparable to the [GLT]." These factors show that the parties meant for GLT to hold the easement unless GLT was unable or unwilling. Having reached that result, the Court must next decide what "the proposed conservation easement" means and whether GLT was "unable or unwilling to accept" it.

### 3. *Terms of the Easement*

While the Settlement plainly states that a conservation easement will be created, it does not specify the easement's terms. It only states that there will be a conservation easement, doc. # 20 at ¶ 9, lays out the physical boundary, *id.*, dictates who shall hold the easement *id.* at ¶ 10, and dictates the procedure by which the easement shall be created. *Id.* Because the intended meaning of "proposed conservation easement" is open to various interpretations, it is legally ambiguous. *See Early v. Kent*, 215 Ga. 49, 50(1), 108 S.E.2d 708 (1959) (ambiguity exists when a written instrument is "open to various interpretations"). The Court will thus resort to the rules of construction and parol evidence to resolve that ambiguity. O.C.G.A. § 13-2-2(1) (allowing parol evidence to explain ambiguity); O.C.G.A. § 24-6-3 ("Parol evidence shall be admissible to explain ambiguities, both latent and patent."); *See also Gans v. Ga. Fed. Sav. & Loan Ass'n*, 179 Ga. App. 660, 663 (1986) (where an ambiguity exists in the written terms, parol evidence may be used in ascertaining intent).

Defendants argue that the clause, "In the event that [GLT] is unable or unwilling to accept the *proposed conservation easement*" (emphasis added), means that the terms of the conservation easement must be "proposed by" defendants. Doc. # 32 at 7. On its face, however, that is a forced, unnatural reading. A more natural reading of "proposed" is that it simply means the conservation easement as proposed by the Settlement and set forth in ¶ 9. Also, in the case of ambiguity, the construction "which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." O.C.G.A. § 13-2-2(5). So viewed, that one word was simply not intended to give defendants the right to unilaterally set the terms of the easement. Thus, the Court rejects defendants' construction.

Next, the Settlement provides that "[d]efendants will create the conservation easement through the *standard procedures* of the Georgia Land Trust, guided by the model conservation easement documents publicly available from that organization."[5] Doc. # 20 at ¶ 10. This language adds another layer of ambiguity. It is unclear from the face of the contract what "standard procedures" means and how this affects the creation of the conservation easement. Thus, the Court resorts to parol evidence. Defendants characterize the "standard procedures" as an "iterative process,"

---

[5] Neither party has entered these documents as evidence, so the Court has not considered them.

5

doc. # 32 at 4, one that requires both parties "to negotiate a conservation easement." *Id.* at 3. They cite to an affidavit of GLT Executive Director Katherine Eddins, in which she states, "[w]e generally prepare the first draft of the Conservation Easement and Pledge agreement and send them to you for review and comment. At this point, we try and focus on the reserved rights and restrictions in the Conservation Easement (CE). This step will continue until both of us are satisfied." Doc. # 32 at 4.

Additionally, defendants point to an email cover letter attached to the first draft of the conservation easement that GLT sent to them. It states that "[i]t is a pretty restrictive easement. Plenty of room to loosen it up within reason." *Id.* at 4-5. Finally, defendant Youmans submitted an affidavit attesting that GLT told defendants that it would "work with" the defendants to create an easement with which both parties "would be satisfied" and that GLT had asked for their input in drafting the easement. Doc. # 32-4 at 2 ¶ 5.

By contrast, Riverkeeper argues that creation through GLT's "standard procedures" does not give defendants the right to dictate the final terms of the easement. Doc. # 33 at 3. Thus, "the only negotiation anticipated in [the Settlement] is the amount of the endowment paid to the GLT." *Id.* Their bottom line is that "[t]here is no veto provision in the Settlement Agreement for either party to reject the GLT's easement document if they did not like what the GLT proffered...." *Id.* Plaintiffs support their position with another Eddins affidavit: "In every easement that [GLT] is involved in, [GLT] drafts the easement documents and submits them to the landowners, not the other way around. This is our standard procedure." Doc. # 34 exh. 1 ¶ 3.

While GLT's procedures include "seeking where possible to accommodate the landowner's interests and need to reserve certain rights ... in order to accept the conservation easement, ultimately it must reflect the basic principles of environmental protection for present and future generations, which it is [GLT's] mission to pursue." *Id.* Furthermore, "GLT cannot take a conservation easement, unless it protects the conservation values of the property." *Id.*

Defendants' evidence shows nothing more than GLT's willingness to accommodate them to the extent possible. GLT's allowance of changes to their draft "within reason," solicitation of "input," and permitting defendants to "review" and "comment" on the draft until they were satisfied, did not give defendants free reign to dictate the terms of the contract. Additionally, the plain language of the Settlement -- directing the creation of the easement to be "guided by" GLT's documents, doc. # 20 at ¶ 10 -- clearly intended to limit defendants' discretion in dictating the easement's terms.

The Court concludes that GLT's "standard procedure" is to create a conservation easement with restrictions that will serve to protect the land. In this case, GLT representatives have testified that the only way GLT could "possibly and responsibly" protect the land and enforce the easement is "to (1) restrict timber harvesting; (2) restrict subdivisions; (3) restrict docks; (4) restrict interior fencing; and (5) restrict development." Doc. # 32-3 at 5 ¶ 14. Defendants have offered no evidence to refute this.

The Court recognizes that in a typical situation, GLT will not force a landowner to give into certain concessions. But in those situations, the parties enter the agreement voluntarily. If the parties do not agree on terms, they will not create a conservation easement. Here, in contrast, the Settlement clearly states

6

that "Defendants *will* create the conservation easement through the standard procedures of [GLT]..." *Id.* Defendant's participation in the process and acceptance of the result thus is mandatory. If GLT and defendants cannot agree on the terms that come out of GLT's procedure, then the Settlement does *not* allow defendants to throw up their hands and walk away.

This result is consistent with the intent of the parties. The proposed conservation easement was agreed to in consideration of plaintiffs' dismissal of its CWA lawsuit. Doc. #27 at 3. The plaintiffs are "non-profit organizations dedicated to preserving the quality of the water in their respective river basins." Doc. # 27 at 17 n. 1. The presumptive easement holder is a non-profit organization whose mission is to pursue "the basic principles of environmental protection for present and future generations." Doc. # 34 exh. 1 ¶ 4. Finally, the purpose of a conservation easement is to *conserve* land.

These circumstances make it clear that the parties' intent was to use the easement to preserve the ecological integrity of the land in question -- as consideration for the lawsuit's dismissal. In order to achieve the Settlement's purpose, the discretion of defendants to dictate the terms of the easement must necessarily be limited. Otherwise, defendants could propose terms that would not preserve the property (and would be unacceptable to any land trust) and then hold this easement itself. That obviously would, as plaintiffs contend, "make a mockery of the language and spirit of the Agreement," and would deprive Riverkeeper of the benefit of their contractual bargain -- "the essential consideration they received by dismissing their case." Doc. # 33 at 5.

**B. Attorneys Fees**

Defendants seek O.C.G.A. § 9-15-14 attorneys fees from plaintiffs because: (1) plaintiffs allegedly violated Settlement Agreement ¶ 14; and (2) plaintiffs' motion "lack[s] any justification based on the clear wording of the Settlement Agreement." Doc. # 32 at 9-10.

Settlement ¶ 14 states, "In the event that Plaintiffs believe that there has been noncompliance with the terms of this Agreement, Plaintiffs will notify Defendants of the noncompliance in writing []." Doc. # 20 ¶ 14. Then "Defendants ... will review the Notice." *Id.* The next step depends on whether "Defendants agree" or "Defendants do no agree" with Riverkeeper's concerns. *Id.* Thus, success of this dispute resolution process requires action by both defendants and Riverkeeper.

Prior to petitioning this Court, Riverkeeper sent a letter of complaint to the defendants that concluded, "We are of course willing to follow the remaining discussion provisions of paragraph 14." Doc. # 34 exh. 4. This put the ball in defendants' court to review Riverkeeper's notice and communicate whether it disagreed or agreed with Riverkeeper's concerns. Defendants had ample notice and opportunity to utilize ¶ 14 to resolve this dispute, but failed to take advantage of it.

The Court would deny the attorneys fee motion on the merits, but suffice it to say that the remedy itself is unavailable in the first place. That is, O.C.G.A. § 9-15-14 does not provide a remedy in federal court. "Congress[, through Rule 11,] has simply preempted this entire area of law... Even were preemption [by Rule 11] not a factor, the very text of Georgia's frivolous litigation statute, O.C.G.A. §

7

9-15-14(a), specifies that it does not apply to a federal court even if that court sits in Georgia." *Carajabal-Ramirez v. Bland Farms,* 234 F. Supp. 2d 1353, 1355 (S.D. Ga. 2001) (cites and quotes omitted); *see also Edwards v. Associated Bureaus, Inc.,* 128 F.R.D. 682, 683 (N.D.Ga. 1989); *Thomas v. Brown,* 708 F. Supp. 336, 338-39 (N.D.Ga. 1989). Thus, defendants' request for attorneys fees under that statute is denied.

### C. Remedy

Before the Court is a Consent Judgment. F.R.Civ.P. 70 ("Enforcing a Judgment for a Specific Act"), authorizes this Court, for a judgment that "requires a party to .. perform [a] specific act," *id.*, to

> order the act to be done -- at the disobedient party's expense -- by another person appointed by the court. When done, the act has the same effect as if done by the party.

Rule 70(a). "The court may also hold the disobedient part in contempt." Rule 70(e).

Accordingly, the Court directs the defendants to create a conservation easement on the parcel and place it with GLT within 60 days of this order. GLT will have the final say on the terms that it feels are necessary to achieve the purpose of protecting the conservation land.

If GLT decides that it is no longer willing or able to hold a conservation easement on the property under any terms, defendants will proactively work with plaintiffs to find a suitable alternate holder comparable to GLT. The terms of that easement will be substantially similar to those GLT judged necessary to preserve the property. The Settlement provides that defendants will retain final approval of any alternate holder should GLT decline to so serve, but that discretion must be exercised in good faith. An easement created under this scenario must be executed within 60 days of this order.

Should this directive not be fulfilled within the 60-day time period, the aggrieved party may apply to this Court for Rule 70(e) contempt relief. Sanctions may include a Rule 70(a) substitution and an attorney-fee award.

### IV. CONCLUSION

The Court *GRANTS* the motion (doc. # 20) of plaintiffs Altamaha Riverkeeper and Ogeechee-Canoochee Riverkeeper to enforce the consent settlement judgment against defendants Rufus Youmans, Mabel Poole and Pine Tree II, LLC. The parties are directed to comply with the Remedy set forth in Part III(C) *supra*.

This __29__ day of September, 2008.

_/s/ B. Avant Edenfield_
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA